IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| HACE and VILLAS CARIBE LLC,<br><br>        Plaintiffs,<br><br>v.<br><br>NAVY FEDERAL CREDIT UNION;<br>CITIZENS BANK, N.A.; and JOHN DOES<br>1-10,<br><br>        Defendants. | Docket No. 2:26-cv-03695 |

## COMPLAINT

Plaintiffs, HACE and Villas Caribe LLC, by and through undersigned counsel, Lamb McErlane P.C., allege as follows:

## I.     NATURE OF THE ACTION

1.     This matter involves an incident of business email compromise ("BEC"), a cybersecurity scam where wrongdoers target parties engaged in funds transfers, typically a home closing or construction project, and trick one of the parties into making a wire to a bank account thought to belong to a party to the transaction but instead belonging to the scammer.

2.     Plaintiffs seek to recover losses resulting from Defendants' failure to adhere to governing banking standards, including obligations under Article 4A of the Uniform Commercial Code as adopted in Pennsylvania, and applicable common law duties.

## II.     PARTIES

3.     Plaintiff HACE is a community development non-profit organization that may be served at 167 W. Allegheny Avenue, Philadelphia, PA 19140.

4.     Plaintiff Villas Caribe LLC ("VC") is a for profit limited liability corporation that may be served at 167 W. Allegheny Avenue, Philadelphia, PA 19140.

1

5.      Defendant Navy Federal Credit Union ("Navy Federal") is a federally chartered credit union headquartered in Vienna, Virginia with its principal place of business in Virginia.

6.      Navy Federal is thus a citizen of Virginia.

7.      Defendant is Citizens Bank, N.A. ("Citizens Bank") is a national association with its headquarters at One Citizens Plaza in Providence, Rhode Island.

8.      Citizens Bank is thus a citizen of Rhode Island.

9.      The amount in controversy exceeds $800,000.00.

10.      Defendants John Does 1–10 are individuals and/or entities whose identities are presently unknown to Plaintiffs, who, upon information and belief, either directly perpetrated, participated in, conspired in, or knowingly aided and abetted the fraudulent scheme that resulted in Plaintiffs' transfer of approximately $809,000.00 to unauthorized accounts. Specifically, John Does 1–10, acting alone or in concert with others, unlawfully infiltrated and/or compromised the business-email account of JBL Construction Services, Inc., intercepted or manipulated legitimate communications, transmitted false wiring instructions to Plaintiffs purporting to be from JBL Construction Services, Inc., provided fraudulent banking information designed to divert Plaintiffs' funds, and/or received, controlled, concealed, transferred, or otherwise benefited from the misappropriated wire funds. Plaintiffs will amend this Complaint to substitute the true names and capacities of John Does 1–10 once their identities are ascertained through discovery.

## III.    JURISDICTION AND VENUE

11.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

12.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

13.    This action arises out of clear and egregious negligence of Navy Federal by accepting a wire transfer of $809,000.00 from Plaintiffs' Citizen's Bank account into a Navy Federal account that had no relation to either Plaintiffs or the named beneficiary on the wire transfer.

14.    Standard banking protocol requires that such a wire transfer be rejected and that the parties be contacted.

15.    BEC fraud is now pervasive, and banks know that name and account mismatches are a major fraud vector.

16.    Commercially reasonable banking practices have evolved and the failure to use available confirmation tools violates ordinary care.

17.    Commercially reasonable security procedures now require some level of beneficiary verification by an originating bank.

18.    Plaintiff HACE is a non-profit organization that is dedicated to assisting low-income families.

19.    As a part of its mission, HACE invests in and assists in developing modern, safe, and efficient low-income housing.

20.    Plaintiff VC is an affiliated entity to HACE, and HACE and VC have been engaged in the construction and updating of the "Villas del Caribe" low-income housing facilities located at 167 W. Allegheny Avenue, Philadelphia, PA 19140.

21.    To that end, Plaintiffs entered into a construction agreement with JBL Construction Services, Inc. ("JBL") and its principal Joe Levin.

22.    JBL acted as the general contractor on the project.

3

23. The cost of the project was in excess of $11,000,000.00.

24. Almost immediately after construction began, JBL began using a new bank, and via email provided Plaintiffs with the new banking instructions.

25. Accordingly, even at the outset of the project, Plaintiffs had experience with JBL using different bank accounts and providing different wiring instructions.

26. In or about April 2024, unbeknownst to JBL, a hacker had infiltrated its email system.

27. Upon information and belief, the sophisticated fraudster began monitoring JBL's emails specifically in order to determine when monetary transfers were being made to JBL's accounts.

28. Upon information and belief, the hacker targeted JBL due to its weak security, but also because it knew that JBL was an on-going general contractor that was likely to be requesting draws on projects on a regular basis.

29. The hacker was correct as Plaintiffs were regularly providing JBL with progress payments.

30. Plaintiffs drew down progress payments from a construction loan they had with Citizens Bank.

31. In mid-May 2024, JBL began requesting payment under Payment Application No. 4. for $809,000.00.

32. Via email, JBL informed Plaintiffs that it had changed banks yet again, this time to Navy Federal, and provided Plaintiffs with new wiring instructions.

33. Given that JBL had already changed banks once during the project, this was not suspicious.

34. However, unbeknownst to Plaintiffs, the fraudster was now in control of JBL's email account, and the new bank and wiring information was being provided to send the $809,000.00 payment to the fraudster at Navy Federal.

35. On May 31, 2024, Plaintiffs again confirmed over email with JBL the accuracy of the wiring information.

36. The fraudster posing as JBL confirmed the wire information.

37. The wire transfer confirmation again identified the beneficiary as "JBL Construction Services, Inc."

38. However, the account number provided corresponded to an account owned by the fraudster, not JBL.

39. On May 31, 2024, Plaintiffs wired $809,000.00 from their Citizens Bank account to Navy Federal.

40. The wire was directed to account number XXXXXX3826.

41. The wire specifically identified "JBL Construction Services, Inc." as the beneficiary.

42. The wire was then deposited in the account bearing account number XXXXXX3826.

43. However, that account number did not correspond with JBL Construction Services, Inc. as the beneficiary.

44. Indeed, it listed another entity or individual as the owner of that account.

45. The beneficiary name and account number did not match.

46. Citizens Bank processed and executed the wire transfer despite this discrepancy.

47. Navy Federal accepted the wire transfer and credited the fraudster's account bearing account number XXXXXX3826.

48. Navy Federal had actual knowledge of the true identity of the account holder of account number XXXXXX3826 because the fraudster opened the account at Navy Federal.

49. Navy Federal is not merely a passive recipient.

50. Navy Federal created the fraudster's beneficiary account, assigned the account number XXXXXX3826, stored the account-holder name, received a wire naming a different beneficiary, yet processed the payment into that account anyway.

51. To open the fraudster's beneficiary account, Navy Federal collected Know Your Customer ("KYC") information, verified the identity of the person opening the account, established the account title, and maintained the ledger.

52. When the incoming wire from Plaintiffs' Citizens Bank account identified the beneficiary's name and account number, Navy Federal already had actual knowledge those identifiers referred to different persons.

53. Accordingly, despite the fact that the beneficiary of the wire and the name on the account number did not match, Navy Federal still deposited the funds in the fraudster's account.

54. This is not only egregiously negligent but violates Navy Federal's written policies on wire transfers.

55. Indeed, on its own website, Navy Federal specifically lists the required information for making a transfer.

56. It requires any payor's to provide the following information: 1) name of beneficiary on the account; 2) payee address; 3) account number; and 4) account type.

6

57.    It further notes that the "required information for recipients" specifically includes the "Name as titled on Navy Federal account."

58.    Despite these requirements, Navy Federal accepted and credited the transfer where the identifying information did not match.

59.    Despite their own "best practices" Navy Federal deposited nearly a million dollars in an account that did not match the beneficiary name on the wire transfer.

60.    Navy Federal markets itself specifically as a "strong, safe, and secure" financial institution.

61.    Despite this, in May 2024, Navy Federal effectively assisted a computer hacker and fraudster in stealing Plaintiffs' wire transfer by failing to check, flag, and freeze a wire transfer intended for JBL that was instead re-routed into an account bearing the name of an individual with no association with JBL.

62.    Further, Navy Federal maintained no best practices in terms of knowing their customer(s) on this account.

63.    Upon information and belief, that account did not regularly have funds wired to it in such large amounts.

64.    Upon information and belief, that account was not identified as the account for a construction company that would regularly receive wired draws for progress payments.

65.    Upon information and belief, prior to the subject transfer, federal banking regulators and industry authorities, including Federal Financial Institutions Examination Council, Financial Crimes Enforcement Network, and other federal banking agencies, had issued advisories, guidance, alerts, and supervisory materials warning financial institutions of the

growing prevalence of business-email-compromise fraud, payment-diversion schemes, account-substitution fraud, and socially engineered wire-transfer fraud.

66.     Such regulatory guidance and industry advisories emphasized the importance of layered security controls, anomaly detection, suspicious-activity monitoring, customer verification procedures, beneficiary validation measures, fraud-risk escalation, employee training, and enhanced review procedures for wire transfers exhibiting elevated fraud indicators.

67.     Upon information and belief, Citizens Bank and Navy Federal were aware of such guidance and industry standards but failed to implement and/or follow commercially reasonable procedures consistent with such evolving fraud risks and industry expectations.

68.     Upon information and belief, Citizens Bank and Navy Federal's failure to adopt and implement commercially reasonable fraud-prevention and beneficiary-verification procedures, in light of known and evolving fraud conditions, departed from prevailing banking-industry standards, Citizens Bank and Navy Federal's own internal policies and risk-management procedures, and reasonable commercial banking practices applicable to high-risk wire-transfer activity.

69.     Navy Federal employed no standard techniques to verify the recipient of the funds.

70.     Citizens Bank also employed no standard techniques to verify the recipient of the funds.

71.     As a result, Plaintiffs lost $809,000.00.

## V.     CLAIMS FOR RELIEF

## COUNT I
### Violation of UCC Article 4A (Statutory Refund)
*(Against Citizens Bank)*

72. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

73. This claim arises under 13 Pa. Cons. Stat. § 4A.

74. Citizens Bank owed duties to Plaintiffs under Article 4A in executing payment orders.

75. Under § 4A-202(c): "If the bank proves that the security procedure is a commercially reasonable method of providing security … the bank is not liable."

76. Citizens Bank failed to employ commercially reasonable security procedures.

77. Citizens Bank processed a payment order despite a mismatch between beneficiary name and account number.

78. Plaintiffs, as originators and/or senders of the subject payment order, issued a wire transfer instruction through Citizens Bank for approximately $809,000.00, intending payment to JBL for legitimate business purposes.

79. The payment order identified JBL as the named beneficiary but contained account information that, due to fraud, corresponded to an unauthorized account controlled by third-party fraudsters.

80. Citizens Bank accepted Plaintiffs' payment order and executed the wire transfer.

81. Under 13 Pa. C.S. § 4A-402(d), if a sender's payment order was not completed by acceptance by the beneficiary's bank in accordance with the sender's order, the sender is entitled to a refund from the receiving bank.

82.     Under 13 Pa. C.S. § 4A-207(c)(2), where a payment order identifies the beneficiary both by name and account number, and the beneficiary's bank accepted payment based on the account number despite a mismatch with the named beneficiary, the sender may be entitled to recover payment where statutory conditions are met.

83.     Prior to accepting the wire order at issue, Citizens Bank did not notify Plaintiffs that a payment order might be made by Navy Federal on the basis of a bank account number even if that number identifies a person different from the named beneficiary.

84.     Despite this knowledge, Citizens Bank failed to adequately warn, notify, or inform Plaintiffs that:

   a.   Navy Federal or intermediary banks could rely exclusively on account numbers;

   b.   A mismatch between beneficiary name and account number may not prevent acceptance of the wire;

   c.   Plaintiffs bore substantial risk if beneficiary information was compromised; and

   d.   Additional verification measures were available or advisable before transmitting the payment order.

85.     Citizens Bank's omission deprived Plaintiffs of material information necessary to make an informed decision regarding the transfer and to implement additional safeguards.

86.     Had Plaintiffs been properly informed, they would have taken additional steps to verify the legitimacy of the payment instructions and likely would not have authorized the transfer.

87.     Citizens Bank's failure to provide adequate notice, disclosure, and commercially reasonable warnings violated its statutory and common law obligations in connection with the execution of Plaintiffs' payment order.

88. Because the payment order was induced by fraud and directed funds to an unintended recipient whose account did not belong to JBL, the transfer was not completed in accordance with Plaintiffs' intended beneficiary designation.

89. As a result, Plaintiffs are entitled to statutory refund rights and reimbursement from Citizens Bank for the improperly executed payment order, including the principal amount transferred, associated fees, and interest as authorized by law.

90. Citizens Bank, as the originating bank for Plaintiffs' payment order, is obligated under Article 4A to refund Plaintiffs to the extent the transfer was not properly completed as required by statute.

91. Despite demand, Citizens Bank has failed and/or refused to fully refund Plaintiffs' losses.

92. As a direct and proximate result of Citizens Bank's statutory violations and failure to provide the required refund, Plaintiffs have sustained damages including but not limited to loss of $809,000.00, fees, interest, consequential damages where recoverable, and litigation costs.

## COUNT II
### Negligent Undertaking
*(Against Citizens Bank)*

93. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

94. Citizens Bank owed a duty to exercise reasonable care in processing wire transfers.

95. Citizens Bank breached that duty by failing to detect and act upon clear discrepancies.

96. Citizens Bank voluntarily undertook to provide Plaintiffs with wire-transfer services, fraud-prevention measures, account-security procedures, transaction-monitoring

systems, and/or suspicious-activity review processes designed to protect customer accounts and detect potentially fraudulent wire activity.

97.    Having undertaken such responsibilities, Citizens Bank owed Plaintiffs a duty to exercise reasonable care in performing such services and procedures.

98.    Upon information and belief, Citizens Bank represented through account agreements, treasury-management materials, security-procedure disclosures, fraud advisories, customer communications, internal policies, website representations, and/or banking-service materials that Citizens Bank maintained fraud-detection systems, suspicious-transaction monitoring, anomaly review procedures, commercially reasonable security procedures, and/or enhanced protections designed to identify unauthorized, suspicious, or potentially fraudulent wire transfers.

99.    Plaintiffs reasonably relied upon Citizens Bank's undertaking and representations concerning wire-transfer security, fraud detection, suspicious-activity monitoring, and commercially reasonable banking practices in utilizing Citizens Bank's wire-transfer services and entrusting Citizens Bank with the processing of the subject transfer.

100.    Despite undertaking to provide fraud-prevention and suspicious-activity review services, Citizens Bank negligently performed such undertakings by failing to identify, investigate, escalate, suspend, verify, or respond to objectively suspicious characteristics associated with the transfer at issue, including beneficiary discrepancies, anomalous payment instructions, and other fraud indicators apparent from the transaction information available to Citizens Bank at the time of processing.

101.    Upon information and belief, Citizens Bank's internal fraud-prevention systems, transaction-monitoring systems, anomaly-detection tools, customer-risk protocols, and/or wire-

review procedures identified or were capable of identifying the suspicious nature of the subject transfer, yet Citizens Bank failed to act reasonably in connection with such information and nevertheless processed the transfer without adequate investigation or verification.

102.    Citizens Bank's breaches caused Plaintiffs' damages.

## COUNT III
### Breach of Ordinary Care
*(Against Citizens Bank)*

103.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

104.    Citizens Bank owed Plaintiffs duties of ordinary care, good faith, and commercially reasonable conduct in connection with the initiation, processing, review, approval, and transmission of wire transfers.

105.    At all relevant times, Citizens Bank knew or should have known that business-email-compromise ("BEC") fraud, payment-instruction fraud, account-substitution fraud, and beneficiary-account diversion schemes involving mismatched beneficiary names and account numbers had become widespread, foreseeable, and well known throughout the banking industry.

106.    Upon information and belief, prior to the wire transfer at issue, Citizens Bank had received industry advisories, fraud bulletins, regulatory guidance, internal warnings, customer complaints, fraud-loss reports, and/or internal risk assessments identifying elevated risks associated with wire transfers involving newly provided beneficiary accounts, altered payment instructions, account-name inconsistencies, and anomalous payment activity.

107.    Despite such known risks, Citizens Bank failed to implement commercially reasonable procedures designed to detect, prevent, investigate, escalate, verify, suspend, reject, or otherwise respond to reasonably identifiable fraud indicators associated with the subject transfer.

108. The wire transfer at issue contained multiple objectively suspicious characteristics and red flags, including but not limited to: newly changed payment instructions; transfer instructions directing payment to an account not previously used by Plaintiffs; discrepancies between the named beneficiary and the beneficiary account information; unusual urgency associated with the transfer request; payment instructions inconsistent with prior transaction history; and/or other anomalies inconsistent with Plaintiffs' historical account activity and payment patterns.

109. Citizens Bank further knew or should have known that a wire transfer in the amount of approximately $809,000.00 presented an unusually high risk of loss to Plaintiffs if the transfer were directed to an unauthorized account.

110. The wire instructions submitted to Citizens Bank identified a beneficiary by name but directed funds to an account maintained by a different person or entity.

111. Under the circumstances presented, a reasonably prudent financial institution exercising ordinary care would have undertaken additional verification measures before transmitting the wire transfer, including contacting Navy Federal to confirm that the account number corresponded to the identified beneficiary and to determine whether Navy Federal intended to process the transfer despite any mismatch between the beneficiary's name and account number.

112. Despite the significant amount of the transfer, the prevalence of business email compromise fraud, and the foreseeable risk of loss associated with beneficiary-name and account-number discrepancies, Citizens Bank failed to undertake any such verification efforts.

113. Had Citizens Bank contacted Navy Federal before transmitting the wire transfer, Citizens Bank would have learned that Navy Federal intended to process the transfer based upon

14

the account number notwithstanding the mismatch between the beneficiary name and account number, thereby revealing the substantial risk that the funds would be transmitted to an unauthorized recipient.

114. Had Citizens Bank communicated that information to Plaintiffs before transmitting the wire transfer, Plaintiffs would not have authorized the transfer and would not have sustained the losses alleged herein.

115. Despite the presence of such red flags, Citizens Bank processed and transmitted the transfer without conducting commercially reasonable verification procedures or additional fraud review.

116. Upon information and belief, commercially reasonable fraud-prevention measures available to Citizens Bank at the time of the transaction included beneficiary-name verification, payee-confirmation procedures, anomaly-detection systems, callback verification procedures, interbank verification requests, enhanced wire-review protocols, fraud scoring, and manual escalation procedures for suspicious transactions.

117. Citizens Bank failed to utilize such available safeguards despite known elevated fraud conditions within the banking industry.

118. Upon information and belief, evolving banking-industry standards, federal regulatory guidance, and published fraud advisories had placed Citizens Bank on notice that traditional account-number-only wire-processing practices were insufficient to address modern fraud conditions involving business-email compromise and payment diversion schemes.

119. Such guidance emphasized layered security procedures, anomaly detection, beneficiary verification, suspicious-activity escalation, and enhanced customer-protection measures in connection with high-risk wire transfers.

120. Citizens Bank nevertheless failed to adopt and/or follow commercially reasonable procedures responsive to such evolving fraud risks.

121. Citizens Bank owed Plaintiffs a duty of ordinary care.

122. Citizens Bank breached that duty by failing to detect and act upon clear discrepancies in the Plaintiffs' wire to JBL.

123. As a direct and proximate result of Citizens Bank's negligence, Plaintiffs suffered damages in an amount to be determined at trial, including but not limited to the loss of approximately $809,000.00, consequential damages, interest, costs, and all other damages recoverable by law.

## COUNT IV
### Breach of Contract
*(Against Citizens Bank)*

124. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

125. Plaintiffs had contractual agreements with Citizens Bank governing wire transfers.

126. Plaintiffs and Citizens Bank entered into one or more agreements governing wire-transfer services, treasury-management services, account security procedures, online banking services, fraud-prevention measures, and/or commercially reasonable security procedures applicable to electronic funds transfers and payment orders.

127. The applicable agreements, policies, disclosures, and/or incorporated procedures required Citizens Bank to utilize commercially reasonable security procedures, exercise ordinary care, act in good faith, implement fraud-prevention protocols, maintain suspicious-activity monitoring procedures, and/or follow agreed-upon verification and authentication measures in connection with the processing of wire transfers.

128.   Upon information and belief, Citizens Bank further represented through contractual materials, banking policies, customer disclosures, fraud advisories, and/or security-procedure documentation that Citizens Bank maintained layered security controls, fraud-detection systems, anomaly monitoring, suspicious-transfer review procedures, and/or enhanced protections responsive to evolving electronic-payment fraud risks.

129.   Citizens Bank materially breached its contractual obligations by failing to follow commercially reasonable security procedures and fraud-prevention measures in connection with the subject wire transfer, including but not limited to failing to identify or respond to suspicious transaction characteristics, failing to implement reasonable beneficiary-verification measures, failing to escalate objectively suspicious payment instructions, failing to conduct adequate fraud review, and/or failing to comply with Citizens Bank's own stated security and fraud-monitoring procedures.

130.   As a direct and proximate result of Citizens Bank's breaches, Plaintiffs suffered loss of the transferred funds and related damages.

**COUNT V**
**Violation of UCC Article 4A (Misdescription)**
*(Against Navy Federal)*

131.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

132.   Under 13 Pa. Cons. Stat. § 4A207(a), "Subject to subsection (b), if … the name, bank account number or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, [then] no person has rights as a beneficiary of the order and acceptance of the order cannot occur."

133.    Under 13 Pa. Cons. Stat. § 4A-207(b):

> If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply: (1)… (2) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, [then] no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

134. Upon information and belief, Navy Federal utilized automated wire-processing and fraud-detection systems that compared incoming payment-order beneficiary information against account information maintained within Navy Federal's own core banking systems.

135. The incoming wire transfer at issue identified a beneficiary name different from the legal title associated with the destination account number maintained by Navy Federal.

136. Upon information and belief, Navy Federal's systems generated one or more discrepancy alerts, mismatch notifications, exception flags, or similar warnings identifying that the beneficiary's name contained in the payment order did not correspond to the account-holder name associated with the beneficiary account number.

137. Despite such alerts, Navy Federal processed and credited the transfer to the mismatched account.

138. Office of Foreign Assets Control ("OFAC") screening software screens incoming wires, beneficiary names, account holders, and counterparties against OFAC sanctions lists and related compliance databases.

139. OFAC screening software often displays the incoming beneficiary name from the wire, the actual account-holder name tied to the account number, and any mismatch or "false positive" alerts.

140. Upon information and belief, Navy Federal maintained and operated OFAC screening, sanctions-screening, and KYC compliance procedures requiring review of account-holder identity information in connection with incoming wire transfers.

141. Navy Federal had previously opened the beneficiary account and collected, verified, and maintained the legal account-holder identity and related KYC information associated with the beneficiary account number.

142. Upon information and belief, Navy Federal's OFAC and/or KYC review systems displayed both (a) the beneficiary name contained in the incoming payment order and (b) the actual account-holder name associated with the beneficiary account number, thereby revealing that the identifiers referred to different persons or entities.

143. Despite possessing such information, Navy accepted and credited the wire transfer to the mismatched account.

144. Upon information and belief, Navy maintained anti-money laundering ("AML") transaction-monitoring systems designed to detect anomalous, suspicious, fraudulent, or mismatched wire-transfer activity.

145. AML systems monitor for unusual wire activity, sudden incoming transfers, transfers inconsistent with account purpose, name/account mismatches, fraud typologies, and rapid withdrawals after incoming wires.

146. These AML systems often generate alerts, case files, escalation tickets, and suspicious activity reviews.

147. Upon information and belief, the wire transfer at issue triggered one or more AML alerts, investigations, escalations, reviews, or monitoring events because the beneficiary name in the payment order differed materially from the account-holder name associated with the

destination account number and/or because the transaction was inconsistent with the known profile and expected activity of the account.

148. Despite such AML monitoring activity, Navy Federal processed, accepted, and/or permitted disbursement of the transferred funds.

149. Upon information and belief, Navy Federal generated and/or maintained internal reports, exception logs, operational notices, audit entries, wire-review records, or discrepancy reports identifying that the beneficiary's name contained in the payment order did not match the account-holder name associated with the beneficiary account number.

150. Upon information and belief, such records were accessible to Navy Federal's wire operations personnel, fraud department, compliance personnel, and/or supervisory employees prior to or contemporaneously with Navy Federal's acceptance of the payment order.

151. Despite such internally generated mismatch information, Navy Federal proceeded to credit the wire transfer to the mismatched account.

152. Upon information and belief, one or more of Navy Federal's employees, agents, compliance personnel, wire-room operators, fraud investigators, supervisors, or other representatives reviewed, observed, received, or otherwise became aware that the beneficiary name stated in the incoming payment order differed from the account-holder name associated with the beneficiary account number maintained by Navy Federal.

153. Despite such actual awareness, Navy Federal accepted the payment order and credited the funds to the mismatched account.

154. Upon information and belief, Navy Federal utilized automated discrepancy-detection systems, including but not limited to wire-screening software, sanctions-screening systems, account-validation tools, fraud-detection software, and/or transaction-monitoring

20

platforms capable of identifying inconsistencies between beneficiary names and beneficiary account numbers.

155.    Upon information and belief, such systems identified that the beneficiary identified in the payment order did not correspond to the owner of the destination account number.

156.    Navy Federal nevertheless processed and accepted the payment order without rejecting, suspending, escalating, or returning the transfer.

157.    Upon information and belief, Navy Federal's wire-processing, account-management, compliance, fraud-monitoring, OFAC-screening, KYC, and/or transaction-review systems contemporaneously displayed and provided Navy Federal with simultaneous access to both (a) the beneficiary name contained in the incoming payment order and (b) the legal account-holder name associated with the beneficiary account number maintained within Navy Federal's own account records and KYC files.

158.    The discrepancy between the beneficiary name identified in the payment order and the account-holder name associated with the destination account number was objectively apparent on the face of the transaction and readily ascertainable from information already possessed and maintained by Navy Federal at the time the wire transfer was processed.

159.    Accordingly, Navy Federal possessed contemporaneous institutional knowledge that the beneficiary name and beneficiary account number referred to different persons or entities before Navy accepted, credited, processed, and/or permitted withdrawal of the transferred funds.

160.    Navy Federal knew that the wire from Plaintiffs' Citizens Bank account contained mismatched information, in that the beneficiary's name and account number referred to different persons.

161. Navy Federal nonetheless accepted and credited the payment based solely upon the account number.

162. Navy Federal is liable for Plaintiffs' losses.

## COUNT VI
### Negligence based on the account opening
*(Against Navy Federal)*

163. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

164. Navy Federal owed a duty to exercise reasonable care in opening accounts.

165. Navy Federal failed to detect fraud indicators at the fraudster's onboarding.

166. A bank may be liable where it took "substantial affirmative risk-creating" steps by opening an account improperly. *Elkin Valley Baptist Church v. PNC Bank, N.A.*, 748 F.Supp.3d 293 (2024).

167. Here, Navy Federal opened the fraudster's account and knew the fraudster's true identity at the time the account was opened.

168. Navy Federal breached its duties to Plaintiffs by failing to comply with its own internal policies and with Federal KYC regulations.

169. Navy Federal breached its duties to Plaintiffs by knowingly permitting withdrawal of fraudulently obtained funds from the fraudster's account.

170. Navy Federal's breaches caused Plaintiffs' damages.

## COUNT VII
### Negligence based on the failure to monitor account
*(Against Navy Federal)*

171. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

172. Navy Federal owed a duty to monitor the accounts that it opened.

173. Navy Federal breached that duty by failing to monitor the fraudster's account.

174. Navy Federal breached that duty by failing to act on suspicious activity within the fraudster's account.

175. Navy Federal accepted a large inbound wire from Plaintiffs and allowed rapid withdrawal by the fraudster, while ignoring red flags.

176. Navy Federal's breaches caused Plaintiffs' damages.

### COUNT VIII
### Negligence based on the duty to non-customers
*(Against Navy Federal)*

177. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

178. Normally, banks owe no duty to non-customers.

179. However, the *Elkin Valley Baptist Church* case expanded the duty to non-customers where the bank conduct "foreseeably increased the risk" of fraud to plaintiffs.

180. Navy Federal's conduct created a foreseeable risk to all entities wiring funds to Navy Federal accounts (including Plaintiffs).

181. Navy Federal owed a duty to Plaintiffs as non-customers because Navy Federal's conduct created a foreseeably increased risk of fraud to Plaintiffs.

182. Navy Federal breached that duty by failing to detect the account beneficiary and account number mismatch, failing to act upon clear discrepancies, and failing to monitor the fraudster's account.

183. Navy Federal's breaches caused Plaintiffs' damages.

## COUNT IX
### Negligent enablement of imposter fraud
*(Against Navy Federal)*

184.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

185.    Bank conduct enabling a fraud scheme is actionable by a non-customer.

186.    This is especially true where there are identity verification failures and account misuse are foreseeable.

187.    Navy Federal owed a duty to exercise reasonable care in verifying account beneficiaries.

188.    Navy Federal breached that duty by enabling imposter fraud, whereby the fraudster was impersonating JBL.

189.    Navy Federal's breaches caused Plaintiffs' damages.

## COUNT X
### Negligence based on the fraudulent concealment
*(Against Navy Federal)*

190.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

191.    Navy Federal owed a duty to exercise reasonable care in assisting Plaintiffs to recover the funds taken by the fraudster.

192.    Plaintiffs contacted Navy Federal about the fraud and Navy Federal ignored those requests.

193.    Thus, Navy Federal's duty of care was triggered, requiring notification of the fraudster's identifying information.

194.    Navy Federal concealed the fraudster's information from Plaintiffs.

24

195.    Navy Federal failed to freeze the fraudster's account.

196.    Navy Federal failed to notify the Plaintiffs of the fraudster's account holder information.

197.    Navy Federal continues to withhold information from Plaintiffs that would identify the fraudsters, as well as the identity of John Does 1-10.

198.    Navy Federal breached their duty by concealing the fraudster's identifying information.

199.    Navy Federal's breaches caused Plaintiffs' damages.

### COUNT XI
### Aiding and Abetting Fraud
*(Against Navy Federal and John Does 1-10)*

200.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

201.    The fraudster(s), John Does 1-10, committed fraud.

202.    Navy Federal and John Does 1-10 had knowledge of suspicious discrepancies contained withing the Plaintiffs' wire transfer to the named beneficiary, JBL.

203.    Navy Federal and John Does 1-10 had knowledge that the beneficiary name of JBL did not match the account number in Plaintiffs' wire.

204.    Navy Federal and John Does 1-10 substantially assisted the fraud by accepting and crediting the transfer to the fraudster's account.

205.    The actions described herein of Navy Federal and John Does 1-10 caused Plaintiffs' damages.

## COUNT XII
### Conversion
*(Against Navy Federal and John Does 1-10)*

206.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

207.    Under Pennsylvania law: "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel…" *Pioneer Commercial Funding Corp. v. Am. Fin. Mortg. Corp.*, 855 A.2d 818, 827 (Pa. 2004).

208.    Plaintiffs possessed rightful ownership and immediate superior possessory rights to the approximately $809,000.00 transferred as a result of fraudulent misrepresentations, as well as all related funds and fees associated with the transaction.

209.    John Does 1-10 intentionally and wrongfully exercised dominion and control over Plaintiffs' funds by obtaining, possessing, transferring, concealing, and/or dissipating the fraudulently diverted $809,000.00.

210.    Such conduct substantially interfered with Plaintiffs' ownership rights.

211.    Navy Federal received, processed, controlled, retained, and/or benefited from portions of Plaintiffs' funds, including transaction fees and related proceeds, despite red flags, discrepancies, and/or failures to implement reasonable safeguards concerning mismatched beneficiary information.

212.    To the extent Navy Federal retained fees, charges, or portions of the transferred funds derived from the fraudulent transaction, Navy Federal wrongfully exercised dominion over funds rightfully belonging to Plaintiffs.

213.    The conduct of Navy Federal and John Does 1-10 deprived Plaintiffs of their property and caused substantial financial harm.

214.    Navy Federal and the fraudster(s), John Does 1-10, exercised unauthorized dominion over Plaintiffs' funds.

215.    As a direct and proximate result, Plaintiffs suffered damages in an amount to be proven at trial, including no less than $809,000.00, fees retained by Navy Federal, consequential losses, interest, and related damages.

## COUNT XIII
### Fraud / Intentional Misrepresentation
*(Against John Does 1-10)*

216.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

217.    John Does 1-10 knowingly misrepresented payment instructions.

218.    Plaintiffs justifiably relied on those misrepresentations.

219.    Upon information and belief, John Does 1-10 intentionally devised, participated in, and executed a fraudulent scheme to induce Plaintiffs to transfer approximately $809,000.00 to unauthorized bank accounts controlled by or accessible to John Does 1-10 and/or their co-conspirators.

220.    In furtherance of this scheme, John Does 1-10 knowingly made, transmitted, or caused to be transmitted false representations of material fact, including but not limited to fraudulent wiring instructions falsely purporting to originate from JBL or authorized representatives.

221.    John Does 1-10 knew these representations were false when made, or acted with reckless disregard for their truth or falsity.

222.    John Does 1-10 intended that Plaintiffs rely upon the fraudulent communications and wiring instructions in order to cause Plaintiffs to transfer funds to accounts designated by John Does 1-10.

223.    Plaintiffs justifiably relied upon John Does 1-10's fraudulent misrepresentations, reasonably believing the wiring instructions were legitimate and authorized.

224.    In reliance on these false representations, Plaintiffs transferred approximately $809,000.00 from Plaintiffs' account at Citizens Bank to the fraudulent recipient account(s) of John Does 1-10 at Navy Federal.

225.    John Does 1-10 thereby wrongfully obtained possession, control, use, or benefit of Plaintiffs' funds.

226.    As a direct and proximate result of John Does 1-10's fraud and intentional misrepresentations, Plaintiffs suffered damages in an amount no less than $809,000.00, plus consequential damages, loss of use of funds, interest, investigative costs, and other related losses.

227.    John Does 1-10's conduct was willful, malicious, intentional, and undertaken with conscious disregard for Plaintiffs' rights, entitling Plaintiffs to punitive or exemplary damages as permitted by law.

228.    Plaintiffs suffered damages.

**COUNT XIV**
**Civil Conspiracy**
*(Against John Does 1-10)*

229.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

230.    Upon information and belief, John Does 1-10 knowingly agreed, combined, associated, and acted in concert with one another and/or other co-conspirators to carry out an

unlawful scheme to defraud Plaintiffs by intercepting or infiltrating JBL's legitimate email communications, transmitting fraudulent wiring instructions, and causing Plaintiffs to transfer approximately $809,000.00 to bank accounts controlled by or accessible to the conspirators.

231. The purpose of the conspiracy was to unlawfully obtain Plaintiffs' funds through false pretenses, fraudulent misrepresentations, and deceptive means.

232. In furtherance of the conspiracy, one or more conspirators committed overt acts, including but not limited to:

    a. Unauthorized access to or manipulation of JBL's email account or communications;

    b. Transmission of false bank account information to Plaintiffs;

    c. Directing Plaintiffs' funds to fraudulent recipient accounts at Navy Federal; and

    d. Accepting, receiving, transferring, concealing, and/or dissipating the stolen funds.

233. As a direct and proximate result of the conspiracy, Plaintiffs suffered damages in an amount of no less than $809,000.00, plus consequential damages, interest, costs, and attorneys' fees as permitted by law.

234. John Does 1-10 knowingly misrepresented payment instructions.

235. Plaintiffs justifiably relied on those misrepresentations.

236. Plaintiffs suffered damages.

## COUNT XV
### Receipt of Stolen Property
*(Against John Does 1-10)*

237. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

238.    John Does 1-10 knowingly received, possessed, controlled, transferred, concealed, and/or retained funds belonging to Plaintiffs that were unlawfully obtained through fraud and deception.

239.    Upon information and belief, John Does 1-10 knew or should have known that the transferred funds were procured through fraudulent means and were the property of Plaintiffs.

240.    Despite such knowledge, John Does 1-10 exercised dominion and control over Plaintiffs' funds inconsistent with Plaintiffs' ownership rights.

241.    John Does 1-10 conduct constitutes wrongful possession, conversion, and/or unlawful receipt of stolen property under applicable law.

242.    As a direct and proximate result, Plaintiffs were deprived of approximately $809,000.00 and suffered additional financial harm.

## COUNT XVI
### Money Had & Received (Restitution)
*(Against John Does 1-10)*

243.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

244.    John Does 1-10 received money belonging in equity and good conscience to Plaintiffs, including approximately $809,000.00 fraudulently diverted from Plaintiffs through false wiring instructions.

245.    John Does 1-10 were unjustly enriched by their receipt, possession, use, transfer, or retention of Plaintiffs' funds.

246.    Under principles of equity, fairness, and restitution, John Does 1-10 should not be permitted to retain benefits wrongfully obtained at Plaintiffs' expense.

30

247.    Plaintiffs have no adequate remedy at law against the John Does 1-10 for the full recovery of all improperly retained funds absent equitable relief.

248.    Plaintiffs are entitled to restitution, disgorgement, and the imposition of a constructive trust over all traceable proceeds of the fraudulent wire transfer.

### COUNT XVII
### Civil RICO
*(Against John Does 1-10)*

249.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

250.    John Does 1-10 engaged in a pattern of racketeering activity.

251.    Predicate acts include violations of 18 U.S.C. § 1343: "Whoever, having devised or intending to devise any scheme or artifice to defraud… transmits… by means of wire…"

252.    At all relevant times, John Does 1-10 constituted an "enterprise" and/or were associated with an enterprise engaged in, or affecting, interstate commerce, within the meaning of 18 U.S.C. § 1961(4).

253.    Upon information and belief, John Does 1-10 conducted and/or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, including but not limited to:

    a.    Wire fraud, in violation of 18 U.S.C. § 1343;

    b.    Computer fraud and abuse;

    c.    Bank fraud;

    d.    Money laundering and/or interstate transportation of stolen funds.

254.    John Does 1-10's predicate acts included multiple interstate electronic communications, fraudulent emails, false wiring instructions, unauthorized access to electronic communications, and movement of stolen funds through banking channels.

255.    These predicate acts were related, continuous, and constituted a pattern of racketeering activity.

256.    John Does 1-10 knowingly conspired to participate in this fraudulent enterprise for the purpose of obtaining money and property from Plaintiffs and potentially other victims through similar schemes.

257.    As a direct and proximate result of John Does 1-10's RICO violations, Plaintiffs suffered injury to their business and property, including the loss of approximately $809,000.00.

258.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, attorneys' fees, and costs.

## COUNT XVIII
### Unjust Enrichment
*(Against All Defendants – In the Alternative)*

259.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

260.    Plaintiffs conferred benefits upon Defendants, including but not limited to the transfer of approximately $809,000.00, related banking fees, processing charges, and other financial benefits resulting from the fraudulent wire transaction.

261.    Navy Federal received and retained benefits including transaction fees, account servicing fees, and other compensation associated with the acceptance, processing, and/or retention of the fraudulent wire transfer.

262.   Citizens Bank received fees, charges, or other financial benefits in connection with processing Plaintiffs' transfer despite its role in executing the transaction that resulted in Plaintiffs' loss.

263.   John Does 1-10 received, controlled, possessed, transferred, concealed, or otherwise benefited from Plaintiffs' fraudulently diverted funds.

264.   Defendants' retention of these benefits is inequitable and unjust under the circumstances because such benefits were derived from fraudulent conduct, wrongful diversion, deficient security practices, and/or improper processing of Plaintiffs' funds.

265.   Defendants were unjustly enriched at Plaintiffs' expense.

266.   It would be inequitable to allow Defendants to retain the benefit.

267.   Equity and good conscience require Defendants to disgorge all benefits unjustly obtained from Plaintiffs.

268.   Plaintiffs are entitled to restitution, disgorgement, and/or constructive trust relief for all amounts wrongfully retained by Defendants.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.   Enter judgment in favor of Plaintiffs and against Defendants;

B.   Award compensatory damages in excess of $809,000.00;

C.   Award punitive damages where permitted by law;

D.   Award pre- and post-judgment interest;

E.   Award attorneys' fees and costs;

F.   Grant such other relief as the Court deems just and proper.

33

## VII.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Respectfully submitted,

**LAMB McERLANE PC**


Date: May 29, 2026                    By:      _/s/ Lauren M. Law, Esquire_
                                             Joel L. Frank, Esquire (I.D. No. 46601)
                                             Scot R. Withers, Esquire (I.D. No. 84309)
                                             Lauren M. Law, Esquire (I.D. No. 320440)
                                             24 East Market Street, P.O. Box 565
                                             West Chester, PA 19381
                                             (610) 430-8000
                                             *Attorneys for Plaintiffs*

34